UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  9/16/21
```

---------------------------------------------------------------X
RICHARD MARTINEZ,                     :
                                      :
                       Plaintiff,     :
                                      :
          -against-                   :            20-CV-7275 (VEC)
                                      :
                                      :         OPINION AND ORDER
UNITED STATES OF AMERICA, ROBERT      :
BEAUDOUIN, M.D., MANDEEP SINGH, P.A., :
YOON KANG, P.A., WARDEN MCC, THE GEO  :
GROUP, INC., THE BROOKLYN HOSPITAL    :
CENTER, PHILLIP MCPHEARSON, M.D., and :
JOHN/JANE DOES Nos. 1-10,             :
                                      :
                       Defendants.    :
---------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

        Between July 2018 and November 2019, Plaintiff was in federal custody — first at

Queens Detention Facility ("QDF"), a private facility operated by Defendant The GEO Group,

Inc. ("GEO Group"), and later at the Metropolitan Correctional Center ("MCC"), a U.S. Bureau

of Prisons ("BOP") facility — while awaiting trial on a criminal charge.  Over the course of

those 16 or so months, Plaintiff repeatedly complained about, *inter alia*, blood in his urine,

painful urination, and back, leg, and chest pain.  Although Plaintiff received some care from the

medical staff at QDF and MCC, Plaintiff was not seen by a urologist or oncologist for months,

despite MCC medical personnel issuing multiple referrals.  Unfortunately, by the time Plaintiff

did see appropriate specialists in November 2019, it was too late; Plaintiff was diagnosed with

Stage IV prostate cancer and found to be paraplegic as a result of tumors having spread to his

spine.  According to Plaintiff, Defendants are liable for providing substandard medical care and

failing to diagnose and treat his serious medical ailments before they had progressed to such a devastating state.

Plaintiff has sued those who were involved in his medical care while in pretrial detention. Plaintiff has sued three members of MCC's medical staff, Dr. Robert Beaudouin, P.A. Mandeep Singh, and P.A. Yoon Kang (collectively the "Individual Federal Defendants," and with the United States, the "Federal Defendants"), pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), for cruel and unusual punishment under the Eighth Amendment and for deprivation of his substantive due process rights under the Fifth Amendment.[1]   Plaintiff has also sued the United States under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, for medical malpractice, negligence, and negligent hiring, supervision, and retention.   Finally, Plaintiff brings a state law medical malpractice claim against the non-federal Defendants involved in Plaintiff's care.[2]

Federal Defendants moved to dismiss Plaintiff's *Bivens* and FTCA claims pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).   Notice of Mot., Dkt. 65.   For the following reasons, Federal Defendants' motion to dismiss is GRANTED in part and DENIED in part.

---

[1]      Plaintiff has also sued the Warden of MCC and John/Jane Does Nos. 1–10, alleged to be personnel employed by BOP or MCC who worked in administrative or other capacities at MCC.

[2]      Plaintiff voluntarily dismissed the Kingsbrook Jewish Medical Center on August 6, 2021.  *See* Dkt. 89.

## BACKGROUND[3]

On or around July 26, 2018, Plaintiff, who at the time was 49 years old, was arrested. Compl. ¶¶ 41–42, Dkt. 1.  Between the date of his arrest and August or September 2018, Plaintiff was held as a pretrial detainee at QDF, a private facility managed by the GEO Group.  *Id.* ¶¶ 41, 46.  While incarcerated at QDF, Plaintiff complained to the medical staff about blood in his urine (the medical term for which is hematuria) and painful, frequent urination; a urine sample revealed red or orange colored urine with a foul odor.  *Id.* ¶ 43.  QDF medical staff suspected that Plaintiff had a urinary tract infection ("UTI"); although no urine culture was performed, they placed Plaintiff on antibiotics.  *Id.* ¶¶ 44–45.

In late August or early September 2018, BOP transferred Plaintiff to MCC.  *Id.* ¶¶ 46–47. Shortly after arriving at MCC, on September 11, 2018, Plaintiff had a urine sample collected for analysis; the urinalysis yielded abnormal results.  *Id.* ¶ 47.  The results of the urinalysis were co-signed by Dr. Beaudouin on May 3, 2019, with no treatment or additional testing occurring during the intervening eight months.  *Id.*  On May 31, 2019, Plaintiff was evaluated by Dr. Beaudouin for hematuria, which Plaintiff reported having started nine months prior but having worsened in the prior two weeks.  *Id.* ¶ 48.  Dr. Beaudouin determined that Plaintiff may have a UTI, and he prescribed Plaintiff antibiotics.  *Id.*  Dr. Beaudouin also requested a computerized tomography ("CT") scan of Plaintiff's abdomen and pelvis and issued a referral for a urology evaluation, both of which were scheduled to occur within a month.  *Id.* ¶¶ 48–49.

Nearly two months later, on July 24, 2019, Plaintiff was taken to Kingsbrook Jewish Medical Center for a CT scan, the results of which indicated that Plaintiff had multiple enlarged

---

[3]   The facts are based on the allegations contained in Plaintiff's complaint, unless otherwise stated.  For purposes of Defendants' motion, the Court accepts all well-pled, non-conclusory factual allegations in the complaint as true and draws all reasonable inferences in the light most favorable to Plaintiff.  *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014); *Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013).

lymph nodes and an enlarged prostate; combined with Plaintiff's history of hematuria, the Kingsbrook medical staff warned of malignancy and recommended that Plaintiff undergo a prostate-specific antigen ("PSA") test.  *Id.* ¶ 51.  Plaintiff's PSA test indicated a significantly elevated PSA level, and, on August 4, 2019, at which point Plaintiff still had not seen a urologist, Dr. Beaudouin created an administrative note stating that he would rewrite the urology referral and would request a prostate biopsy to further evaluate Plaintiff for prostate cancer.  *Id.* ¶¶ 52–53.

On August 28, 2019, following a second PSA test that confirmed Plaintiff's significantly elevated PSA level (Plaintiff's reading was then more than 50 times the normal range), Dr. Beaudouin referred Plaintiff to the emergency room for evaluation to rule out prostate cancer and requested that Plaintiff be evaluated by a urologist.  *Id.* ¶¶ 54–55.  On August 30, 2019, Plaintiff was taken to the Brooklyn Hospital Center, where he underwent a urinalysis but did not see a urologist or have a prostate biopsy performed; he was discharged with instructions to follow up with a urologist.  *Id.* ¶ 56.

On September 21, 2019, Plaintiff, who reported continued hematuria and pain, was seen by P.A. Kang.  *Id.* ¶ 60.  On that same date, Plaintiff underwent additional urinalysis — which again yielded abnormal results, including elevated white and red blood cell counts — and Dr. Beaudouin again referred Plaintiff to a urologist.  *Id.* ¶ 60.  Despite the fact that the urology referral was approved on September 26, 2019, Plaintiff was not taken to a urologist.  *Id.*  On October 18, 2019, Dr. Beaudouin entered an administrative note stating that Plaintiff had been scheduled for an appointment at the urology clinic the previous day but that the correctional services department had not taken him to the appointment.  *Id.* ¶ 62.

In late October 2019, Plaintiff was seen by P.A. Singh twice for a variety of complaints, including sharp chest pain and persistent, sharp lower back pain radiating to his groin that had

been ongoing for five weeks but was worsening. *Id.* ¶¶ 64–65.  P.A. Singh referred Plaintiff to cardiology for an echocardiogram and prescribed him Tylenol. *Id.*  On October 29, 2019, Plaintiff saw Dr. Beaudouin for back pain, hematuria, painful urination, and nocturia, or waking in the night to urinate. *Id.* ¶ 66.  Dr. Beaudouin prescribed Tamsulosin — commonly known by the brand name Flomax — for "disorder of the prostate" and Tylenol, and he instructed Plaintiff to follow up with sick call as needed; at that time, Plaintiff's medical records indicated there were pending urology and cardiology appointments. *Id.* ¶¶ 52–53.

Plaintiff's health issues continued into November 2019.  In addition to Plaintiff's consultations with the MCC medical staff, between September 13, 2019, and November 4, 2019, Plaintiff made approximately nine sick call requests to MCC medical staff, in which he repeatedly complained of hematuria, pain in his back, leg, shoulder, and chest. *See id.* ¶¶ 58, 59, 61, 63, 67, 68.  On November 7, 2019, Plaintiff reported to P.A. Singh intense chest pain, leg pain and numbness, and continued hematuria. *Id.* ¶ 69.  P.A. Singh responded to Plaintiff's complaints by stating that he would not die from urinating blood given that Plaintiff had been urinating blood for seven months; P.A. Singh also informed Plaintiff that he was not in the midst of a medical emergency, which would require Plaintiff to have a heart attack or to have stopped breathing. *Id.* ¶ 69.  On November 10, 2019, Plaintiff reported to P.A. Singh that he could barely stand, was in severe pain, and had been experiencing urinary incontinence; P.A. Singh again informed Plaintiff that his condition was not an emergency and that he had already spoken to the doctor about Plaintiff's case. *Id.* ¶ 71.  Between November 10–12, 2019, Plaintiff could not get out of bed, a fact of which medical staff and MCC guards were aware. *Id.* ¶ 72.

On November 12, 2019, Plaintiff saw Dr. Beaudouin, who noted that Plaintiff complained of numbness and weakness in his lower body. *Id.* ¶ 73.  At Dr. Beaudouin's request, Plaintiff was transferred to a hospital; an MRI of his thoracic spine revealed a large spinal tumor

and spinal cord compression.  *Id.* ¶¶ 73–74.  Plaintiff was transferred to Bellevue Hospital for

emergency decompression surgery, which was performed on November 13, 2019.  *Id.* ¶¶ 74–75.

After surgery, Plaintiff was determined to be paraplegic and diagnosed with Stage IV prostate

cancer.  *Id.* ¶ 76.  Plaintiff has undergone significant medical treatment, but his condition is

permanent and fatal.  *See id.* ¶¶ 76–78.

Plaintiff first filed an administrative claim with BOP on December 16, 2019.  *Id.* ¶ 6; *see*

*also* Dkt. 67-1.  Plaintiff filed a second administrative claim with BOP on May 5, 2020, which

Plaintiff contends operated as a supplement, providing BOP with additional information on his

claims and their value.  Compl. ¶ 7; *see also* Dkt. 67-2.

## DISCUSSION

### I.  Legal Standard on a Motion to Dismiss

#### A.  Rule 12(b)(1)

"Determining the existence of subject matter jurisdiction is a threshold inquiry," pursuant

to which the court may properly dismiss a claim for lack of subject matter jurisdiction "when the

district court lacks the statutory or constitutional power to adjudicate it."  *Morrison v. Nat'l*

*Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (quotation omitted).  Plaintiff has the burden

of proving by a preponderance of the evidence that subject matter jurisdiction exists.  *Makarova*

*v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  In resolving a Rule 12(b)(1) motion, "the

district court must take all uncontroverted facts in the complaint . . . as true, and draw all

reasonable inferences in favor of the party asserting jurisdiction."  *Fountain v. Karim*, 838 F.3d

129, 134 (2d Cir. 2016) (quoting *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d

239, 243 (2d Cir. 2014)).  To the extent "jurisdictional facts are placed in dispute," however, "the

court has the power and obligation to decide issues of fact by reference to evidence outside the

pleadings, such as affidavits." *Tandon*, 752 F.3d at 243 (quoting *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003)).

The United States is generally immune from suit pursuant to the doctrine of sovereign immunity. *See FDIC v. Meyer*, 510 U.S. 471, 475 (1994). Congress, however, may waive the United States' immunity, with the conditions of the government's consent to suit strictly construed. *See Millares Guiraldes de Tineo v. United States*, 137 F.3d 715, 719 (2d Cir. 1998). "The waiver of sovereign immunity is a prerequisite to subject-matter jurisdiction." *Presidential Gardens Assocs. v. United States ex rel. Sec'y of Hous. & Urban Dev.*, 175 F.3d 132, 139 (2d Cir. 1999) (citation omitted). "Whether the United States is immune from suit is a jurisdictional question, and, therefore, is properly decided on a [Rule] 12(b)(1) motion." *Ruiz v. United States*, No. 17-CV-6727, 2019 WL 952712, at *2 (S.D.N.Y. Feb. 27, 2019) (citation omitted).

### B.   Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)). "[A] complaint does not need to contain detailed or elaborate factual allegations, but only allegations sufficient to raise an entitlement to relief above the speculative level." *Keiler v. Harlequin Enters., Ltd.*, 751 F.3d 64, 70 (2d Cir. 2014) (citation omitted). The court is not required, however, to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). In deciding a motion brought pursuant to Rule 12(b)(6), Courts are generally confined to "the four corners of the complaint" and must "look only to the allegations contained therein." *Perez v. Westchester Foreign Autos, Inc.*, No. 11-CV-6091, 2013 WL 749497, at *5 (S.D.N.Y. Feb. 28, 2013) (citing *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)).

## II. *Bivens* Claims[4]

Plaintiff brings *Bivens* claims against each of the Individual Federal Defendants, as well as the Jane/John Doe Defendants and the Warden of MCC,[5] for failing to provide him with adequate medical care despite knowing that failing to do so posed an excessive risk to his well-being.  Plaintiff alleges that his pattern of complaints and his symptoms did or should have made clear to Defendants that he would suffer permanent harm if he did not receive appropriate treatment, yet Defendants did not ensure that Plaintiff received proper medical treatment from necessary specialists and did not ensure that their referrals were acted upon.

Because the Court finds that, based on Plaintiff's allegations, a reasonable jury could find that Dr. Beaudouin and P.A. Singh were deliberately indifferent to Plaintiff's medical needs, their motion to dismiss the *Bivens* claims is denied.  Plaintiff's allegations are insufficient, however, to plead that P.A. Kang was deliberately indifferent to his medical needs, and, therefore, the *Bivens* claims against her are dismissed.

---

[4]     Plaintiff's standalone claim against the Individual Federal Defendants for cruel and unusual punishment under the Eighth Amendment is dismissed.  During the period in which he alleges deliberate indifference, Plaintiff was a pretrial detainee.  *See United States v. Martinez*, No. 18-CR-526-5, Dkt. 331 (Judgment as to Mr. Martinez in the criminal action dated November 5, 2020).  During that period, Plaintiff had not yet been convicted of a crime and was not being punished; accordingly, the proper avenue for Plaintiff to assert a deliberate indifference claim is the Fifth Amendment's Due Process Clause, not the Eighth Amendment.  *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (holding that a pretrial detainee cannot bring a claim under the Cruel and Unusual Punishments Clause and that claims must be brought pursuant to the Due Process Clause); *Laurent v. Edwin*, No. 17-CV-3300, 2021 WL 1152962, at *10 (E.D.N.Y. Mar. 5, 2021) (same).  It is for perhaps that reason that Plaintiff abandoned his Eighth Amendment claim by failing to oppose Defendants' arguments in support of dismissal in their brief.  *Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08-CV-442, 2014 WL 4723299, at *7 (S.D.N.Y. Sept. 23, 2014).

[5]     On December 3, 2020, Plaintiff informed the Court by letter that it did not intend to complete service on the Warden of the MCC.  *See* Dkt. 49 at 2 n.2.  A review of the docket confirms that, in the intervening months, Plaintiff has not served the Warden, nor sought any extension of time within which to serve the Warden.  Accordingly, the Warden of the MCC is dismissed without prejudice pursuant to Federal Rule of Civil Procedure 4(m).  *See* Fed. R. Civ. P. 4(m).

### A.  Applicable Law

Pursuant to *Bivens*, a plaintiff may sue a federal officer in his personal capacity for violating certain of plaintiff's constitutional rights.  "To state a claim under *Bivens*, a plaintiff must allege that an individual defendant personally committed a specific wrongful act that violated a well-established constitutional right of which a reasonable person would have known." *Adekoya v. Holder*, 751 F. Supp. 2d 688, 694 (S.D.N.Y. 2010) (citing *Barbera v. Smith*, 836 F.2d 96, 99 (2d Cir. 1987)).

Although a pretrial federal detainee may not assert a claim for inadequate medical treatment under the Eighth Amendment's Cruel and Unusual Punishment Clause, a pretrial detainee may assert such a claim under the Due Process Clause of the Fifth Amendment.  *See Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (holding Eighth Amendment inapplicable to pretrial detainees); *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000) ("We have often applied the Eighth Amendment deliberate indifference test to pre-trial detainees bringing actions under the Due Process Clause of the Fourteenth Amendment.  We see no reason why the analysis should be different under the Due Process Clause of the Fifth Amendment.") (cleaned up).  A pretrial detainee's due process rights "are at least as great as the Eighth Amendment protections available to a convicted prisoner."  *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) (citation omitted).

A two-prong test applies to claims of inadequate medical care brought under the Due Process Clause.  *See Darnell*, 849 F.3d at 21 n.3 (holding that the analysis applicable to inadequate medical care claims arising under the Fourteenth Amendment applies equally to claims arising under the Fifth Amendment).  A plaintiff must show that: (1) he had a serious medical need; and (2) the defendant acted with a deliberate indifference to plaintiff's serious medical need.  *See Charles v. Orange County*, 925 F.3d 73, 85–86 (2d Cir. 2019) (citation

omitted).  The first prong has been termed the "objective prong," in that "the challenged conditions [must be] sufficiently serious to constitute objective deprivations of the right to due process." *Darnell*, 849 F.3d at 29.  The second prong, known as the "subjective prong," is more accurately referred to as the "*mens rea* prong."  *Id.*  This prong requires a showing that "the officer acted with at least deliberate indifference to the challenged conditions[,]" understood to mean roughly "recklessness," but where recklessness can be defined either "subjectively (what a person actually knew, and disregarded), or objectively (what a reasonable person knew, or should have known)."  *Id.* (citation omitted).

### B.  Deliberate Indifference

On this motion, the Individual Federal Defendants concede that Plaintiff's medical needs were "sufficiently serious" to satisfy the objective prong of Plaintiff's claims.  *See* Defs. Reply at 3, Dkt. 75.  Accordingly, the Court need only decide whether Plaintiff has alleged adequately that the Individual Federal Defendants were deliberately indifferent to Plaintiff's serious medical needs.

To plead deliberate indifference, a plaintiff must allege that a defendant "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the [defendant] knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35.  Because deliberate indifference requires only a showing of "something akin to recklessness," a plaintiff need not allege "a malicious or callous state of mind."  *Charles*, 925 F.3d at 86 (citing *Darnell*, 849 F.3d at 33–34).  A plaintiff may not, however, rely on a showing of "mere negligence" to plead adequately deliberate indifference.  *Id.* at 87.  Although "mere medical malpractice is not tantamount to deliberate indifference, . . . it may rise to the level of deliberate indifference when it involves culpable recklessness, i.e., an act or a failure to

act . . . that evinces a conscious disregard of a substantial risk of serious harm." *Cuoco*, 222 F.3d at 107 (cleaned up).  "Whether [a defendant] knew or should have known of the substantial risk of harm to the detainee is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Charles*, 925 F.3d at 87 (citation omitted).

### i.  Dr. Beaudouin

Plaintiff appears to assert multiple bases for finding Dr. Beaudouin liable for reckless indifference to Plaintiff's serious medical needs.  First, Plaintiff contends that Dr. Beaudouin was responsible for failing to review Mr. Martinez's initial urinalysis results for over eight months, and thus he was responsible for the initial eight-month delay in treatment.  Pl. Opp. at 17 (citing Compl. ¶¶ 47, 144), Dkt. 72.  Reviewing the allegations in the light most favorable to Plaintiff and drawing all inferences in his favor, the Court infers that no medical professional reviewed the results from Plaintiff's September 2018 urinalysis until May 2019 and will ascribe this period of delay to Dr. Beaudouin at this stage of the case.[6]  Plaintiff alleges that Dr. Beaudouin co-signed the results of the urinalysis in May 2019, and Dr. Beaudouin was otherwise responsible for ordering urinalysis and similar tests during Plaintiff's time at MCC.  *See* Compl. ¶ 47.

Plaintiff's allegations fall short of pleading deliberate indifference based solely on this eight-month delay in reviewing test results.  Plaintiff does not include any allegations concerning his medical ailments at the time the urinalysis was ordered at MCC; he had previously complained of hematuria and painful, frequent urination, but those complaints were lodged at QDF.  *See id.* ¶ 43.  To allege that Dr. Beaudouin was deliberately indifferent to Plaintiff's serious medical needs by failing to review the results for eight months, Plaintiff had to allege

---

[6]      On this motion to dismiss, the Court may not and does not consider Plaintiff's assertion that discovery has revealed that Dr. Beaudouin ordered the September 2018 urinalysis, the results of which he did not review until May 2019.  *See* Pl. Opp. at 5 n.2; *see also Roth*, 489 F.3d at 509.

facts giving rise to an inference that Dr. Beaudouin knew or should have known of a substantial risk to Plaintiff's health.  *See Charles*, 925 F.3d at 87.  Plaintiff has not done so here.[7]

The bulk of Plaintiff's allegations concern the treatment, or lack thereof, that he received between May 2019 and November 2019.[8]  Distilled, Plaintiff alleges that, by failing to ensure that Plaintiff received the necessary tests and treatment by a urologist — despite continued complaints and test results highly indicative of advanced prostate cancer — Dr. Beaudouin was deliberately indifferent to the near-certainty that Plaintiff had prostate cancer.  The primary basis for Dr. Beaudouin's liability, therefore, rests on the fact that, knowing the previous referrals failed to result in Plaintiff being seen by a specialist and knowing that Plaintiff required immediate medical attention from a specialist, given his test results and symptoms, he failed to take action to ensure that Plaintiff received care from a urologist.

Defendants argue that Plaintiff failed to plead that Dr. Beaudouin was deliberately indifferent to his medical needs.  First, Defendants argue that Plaintiff's own pleading acknowledges that the Individual Federal Defendants each provided Plaintiff with adequate care during the course of his incarceration at MCC, notwithstanding the delay in facilitating Plaintiff's appointment with a urologist.  *See* Defs. Mem. at 10, 12, Dkt. 66.  Second, Defendants contend that Plaintiff failed to allege that any of the Individual Federal Defendants were in any

---

[7]    While Plaintiff's allegations regarding the delay in reviewing test results alone does not adequately allege deliberate indifference, that shockingly long delay is powerful circumstantial evidence that, combined with other evidence, may prove that Dr. Beaudouin was deliberately indifferent to Plaintiff's care.

[8]    To the extent Plaintiff argues that Dr. Beaudouin is liable for deliberate indifference on account of the two-day delay in November 2019 between Plaintiff being physically unable to get out of bed and Plaintiff being sent to the hospital, Plaintiff fails to allege that Dr. Beaudouin was aware of Plaintiff's paralysis at that time or that Dr. Beaudouin was in any way responsible for the delay.  Plaintiff instead alleges only that "medical staff . . . were advised" of his condition on or around November 10, 2019, and that he was evaluated by Dr. Beaudouin on November 12, 2019, the day on which Plaintiff was transferred to the hospital for emergency tests and treatment. Compl. ¶¶ 73–74.  This delay can, however, be considered as part of a "pattern of delays" Plaintiff experienced in receiving adequate treatment that raises an inference of deliberate indifference.  *See Madera v. Ezekwe*, No. 10-CV-4459, 2013 WL 6231799, at *13 (E.D.N.Y. Dec. 2, 2013) (citing *Abdush Shahid v. Coughlin*, 933 F. Supp. 168, 182 (N.D.N.Y. 1996)).

way responsible for the delay in Plaintiff receiving an appointment with a urologist. *See id.* at

10–11, 18–20. Neither argument is availing at this stage of the case.

Defendants are correct that Dr. Beaudouin provided a host of medical services to Plaintiff

between May and November 2019. *See, e.g.*, Compl. ¶¶ 48, 49, 55, 60, 66, 73. But the fact that

Dr. Beaudouin prescribed Plaintiff certain medicines, issued referrals to specialists, ordered

multiple tests, and facilitated his trip to a hospital does not, *ipso facto*, absolve him of liability

inasmuch as Plaintiff's allegations are predicated on Dr. Beaudouin's failure to ensure that he

received care from a urologist. The provision of some medical care while other critical care is

not provided does not absolve Dr. Beaudouin of liability for the delay in the provision of the

omitted, critical service. *See Hathaway v. Coughlin*, 37 F.3d 63, 68 (2d Cir. 1994) (holding that

"the fact that [defendant] frequently examined [plaintiff does not] necessarily vindicate

[defendant]" where "[t]he course of treatment [plaintiff] received clearly did not alleviate his

suffering"); *Price v. Reilly*, 697 F. Supp. 2d 344, 364 (E.D.N.Y. 2010) ("The fact that defendants

offered some treatment in response to plaintiff's complaints does not as a matter of law establish

that they had no subjectively culpable intent.") (citation omitted); *see also Lloyd v. Lee*, 570 F.

Supp. 2d 556, 562–63, 569–70 (S.D.N.Y. 2008) (denying motion to dismiss claim for deliberate

indifference based on failure to follow-up on referrals despite consistent treatment during the

period of delay). The Second Circuit has expressly

> decline[d] to adopt a rule that in effect would exempt general practitioners from
> being found deliberately indifferent to a patient's serious medical needs as long as
> that general practitioner at some point refers the patient to a specialist, regardless
> of the extent of contact that general practitioner has with the patient.

*Hathaway*, 37 F.3d at 68.

A doctor's failure to follow up and ensure necessary treatment after issuing a referral for

treatment or to a specialist can, under certain circumstances, provide a basis for liability on a

claim for deliberate indifference.  Plaintiff relies heavily on *Lloyd*, in which the court concluded that the plaintiff had stated a plausible claim of deliberate indifference against doctors who, despite repeated requests that an MRI of the Plaintiff be taken, had "permitted nine months to go by before the MRI was actually taken."  *Lloyd*, 570 F. Supp. 2d at 561.  The court held that the plaintiff's complaint "plausibly allege[d] that doctors knew that Lloyd was experiencing extreme pain and loss of mobility, knew that the course of treatment they [had] prescribed was ineffective, and declined to do anything to attempt to improve Lloyd's situation besides re-submitting MRI request forms."  *Id.* at 569.  Accordingly, the court found that "[a] reasonable jury could infer deliberate indifference from the failure of the doctors to take further steps to see that Lloyd was given an MRI," and had they "followed up on the numerous requests for an MRI, the injury would have been discovered earlier, and some of the serious pain and discomfort that Lloyd experienced for more than a year could have been averted."  *Id.* (citation omitted).

    In the wake of *Lloyd*, several other courts in the Second Circuit have held that a doctor can be found to have been deliberately indifferent based on a failure to ensure that a detainee received a necessary test or was seen by a specialist, even if the doctor issued one or more referrals.  *See, e.g.*, *Giraud v. Feder*, No. 20-CV-1124, 2021 WL 1535751, at *4 (D. Conn. Apr. 19, 2021) (finding that plaintiff's allegation that a doctor "failed to follow up to ensure that he received an MRI or further treatment" was sufficient "for purposes of initial review . . . to evince deliberate indifference to serious medical needs"); *Williamson v. Naqvi*, No. 19-CV-4, 2019 WL 2718476, at *6 (D. Conn. June 27, 2019) ("To the extent that Dr. Pillai provided no treatment in response to the plaintiff's complaint of chronic knee pain in July/August 2013 and thought an MRI was medically necessary [and ordered plaintiff to undergo x-rays and an MRI] due to the plaintiff's symptoms of chronic knee pain in February 2015, but failed to facilitate or arrange for the MRI, the plaintiff has stated a plausible claim of deliberate indifference to medical needs.")

(citation omitted); *Madera v. Ezekwe*, No. 10-CV-4459, 2013 WL 6231799, at *16 (E.D.N.Y. Dec. 2, 2013) (concluding that doctors' failure "to follow up on missed appointments and . . . to schedule new appointments" after issuing an outpatient referral, viewed in the context of a broader pattern of delays in treatment, could lead a reasonable jury to conclude doctors were deliberately indifferent to plaintiff's medical needs); *Price*, 697 F. Supp. 2d at 362 (finding that a nine-month delay in arranging kidney transplant test and several months' delay in conducting scheduled x-ray exam both adequately stated a claim for deliberate indifference) (citation omitted).

Defendants seek to distinguish this case from *Lloyd* in several ways, none of which is persuasive. First, Defendants argue that in *Lloyd*, the court found that plaintiff plausibly alleged that the doctors did nothing to improve the plaintiff's situation other than re-submitting the MRI requests, whereas here, Plaintiff's allegations demonstrate that Dr. Beaudouin provided a range of care during the period in which Plaintiff should have been seen by a urologist.[9] Defs. Mem. at 14–15. But the facts of *Lloyd* are not quite as described: between the date on which Lloyd's doctors first requested an MRI and the date on which the MRI was performed, Lloyd received physical therapy, his doctors issued requests for different medical tests, and he was seen by specialists at hospitals after referrals were issued by BOP medical staff. *See Lloyd*, 570 F. Supp. 2d at 562–64. In short, Defendants' argument does not hold water.

---

[9]     The Court notes that the actual care provided was not impressive, even to a layperson. According to the Complaint, on May 31, 2019, in response to a complaint that Plaintiff had been experiencing blood in his urine for nine months, Dr. Beaudouin prescribed antibiotics. Compl. ¶ 48. Antibiotics presumably would have been an effective treatment if Plaintiff had actually *had* a urinary tract infection, a diagnosis that could have been confirmed fairly quickly if Dr. Beaudouin had ordered *and reviewed* a urinalysis. While Dr. Beaudouin had Plaintiff transferred to an emergency room more than two months later to rule out cancer (the Court cannot conceive why a doctor would believe an emergency room visit was the most efficacious way to get the Plaintiff diagnosed), Plaintiff was returned to MCC without cancer having been ruled out and with the emergency room doctor advising Plaintiff to follow up with a urologist. *Id.* ¶¶ 55–56. *Two months later,* with Plaintiff still complaining of pain and blood in his urine, Dr. Beaudouin's "treatment" consisted of a prescription for Flomax (a drug used to treat men with enlarged prostates) and Tylenol (an over-the-counter pain medication). *Id.* ¶ 66. The notion that those facts somehow undercut a claim of deliberate indifference would be laughable if the entire case were not so tragic.

Defendants' second purported basis for distinguishing *Lloyd* overlaps with their second overarching argument in favor of dismissal of Plaintiff's *Bivens* claims.  Defendants argue that, in *Lloyd*, the plaintiff had plausibly alleged that "prison doctors were engaging in a blame shifting process, which resulted in the unreasonable delays," but here, Plaintiff has not pled any similar facts.  Defs. Mem. at 15 (quoting *Lloyd*, 570 F. Supp. 2d at 568).  To much the same effect, Defendants also argue that Plaintiff does not plausibly allege that the Individual Federal Defendants were responsible for the fact that he did not timely see a urologist or oncologist, and thus they cannot be held liable for any alleged delay in treatment.  *See id.* at 18–20.

But in *Lloyd* and similar cases, liability is often founded not directly on the delay itself, but on a doctor's failure to take action above and beyond merely issuing and re-issuing a referral. *See Lloyd*, 570 F. Supp. 2d at 561 ("Given the seriousness of [plaintiff's] injuries and his repeated complaints of severe pain, a reasonable jury could infer that the doctors acted with deliberate indifference by failing to take steps to ensure that [plaintiff] was given an MRI and other medical care in a more timely manner.").  In *Lloyd*, the court's statement that plaintiff alleged a "blame shifting process" was clearly not the basis on which the court determined that Plaintiff's claims of deliberate indifference survived the motion to dismiss.  Instead, the *Lloyd* court was quite clear that liability against the doctors was premised on their failure to "follow up on their MRI requests, thereby failing to remedy [plaintiff's] medical issues." *Id.* at 568.

The conduct for which Plaintiff seeks to hold Dr. Beaudouin liable is failing to ensure that he was seen by a qualified specialist given the severity of his condition and the likelihood of serious, negative consequences if he did not receive immediate care from a urologist; put differently, liability is premised on Dr. Beaudouin's decision passively to write referrals knowing full well that prior referrals had not been acted on and that the "course of treatment" in which he was engaged was insufficient given Plaintiff's serious medical needs.  In these circumstances and

16

at this stage of the case, the fact that the delays in Plaintiff being taken to see a urologist may have been attributable to decisions by or the inaction of others is not fatal to Plaintiff's claim. *Cf. Johnson v. Bowers*, 884 F.2d 1053, 1056–57 (8th Cir. 1989) (rejecting defendants' argument that blame did not rest with them for delay in prisoner having surgery and holding that medical staff was "required to expeditiously arrange for surgical correction . . . by a qualified surgical specialist" and that "[t]he responsibility for securing medical care for prisoner's needs rests with the prison authorities"); *Norman v. Mount Vernon Hosp.*, No. 17-CV-9174, 2020 WL 4432063, at *9 (S.D.N.Y. July 31, 2020) ("Although referral to a specialist does not always constitute sufficient care, cases finding that referral was inadequate involved defendants who saw or received complaints from injured plaintiffs over a period of time and failed to provide medical aid for an injury.").  Plaintiff's allegations that Dr. Beaudouin's actually knew that Plaintiff had not been seen by a urologist or received necessary care despite his worsening condition and despite clear signs that Plaintiff had cancer are sufficient to survive Defendants' motion to dismiss.  *See Singletary v. Russo*, 377 F. Supp. 3d 175, 193 (E.D.N.Y. 2019) (dismissing claim against a doctor who was unaware of delay in plaintiff seeing a specialist after issuing a referral because, unlike in *Lloyd* and *Price*, the doctor did not have "actual or constructive notice of the immediate medical needs of the respective plaintiffs").[10]

---

[10]     The Court notes that several courts have permitted a plaintiff's claim of deliberate indifference to proceed past the motion to dismiss stage even without allegations that the defendant was *personally* responsible for a delay in treatment, as opposed to the delay being caused an external force. *See Brown v. Coughlin*, 758 F. Supp. 876, 882–83 (S.D.N.Y. 1991) ("Although he fails to attribute specific acts to specific officials, the allegations clearly set out a pattern from which one might infer at least deliberate unconcern for [plaintiff's] apparent suffering. This unconcern could be attributable to the hospitals and the institutions alike.").

        The Court also notes that Defendants' argument — that because Dr. Beaudouin did not personally delay taking Plaintiff to the urologist he cannot be liable — taken literally would essentially immunize BOP medical staff from claims of deliberate indifference whenever the claim arises from the failure to obtain specialized medical care for a detainee.  BOP medical staff does not transport detainees to outside doctors; corrections staff does.  But in appropriate circumstances, as here, BOP medical staff can insist that a medical situation is sufficiently serious that a detainee must be transported for specialized examination and care.  While further development of the facts may

Accordingly, because Dr. Beaudouin was aware of Plaintiff's repeated complaints of hematuria and accompanying pain over the course of many months and was aware that Plaintiff had not yet seen a urologist despite Dr. Beaudouin's repeated referrals, the Court concludes that a jury could infer deliberate indifference from Dr. Beaudouin's failure to take affirmative actions to obtain appropriate medical care for Plaintiff. *See Hathaway*, 37 F.3d at 68.

### ii.   P.A. Singh

P.A. Singh was less intimately involved in Plaintiff's care than Dr. Beaudouin, and he also does not appear to have been involved in issuing any referrals to a urologist. Nevertheless, Plaintiff's claim for inadequate medical treatment against P.A. Singh survives his motion to dismiss.

Plaintiff's allegations raise an inference that P.A. Singh was aware of Plaintiff's ongoing medical issues, specifically his longstanding complaints of hematuria and accompanying pain, and that Plaintiff had not yet received a definitive diagnosis or treatment plan for his condition. P.A. Singh reportedly told Plaintiff that he was not suffering from an emergency on account of his hematuria because he had been urinating blood for seven months; P.A. Singh also told Plaintiff that P.A. Singh had consulted with MCC doctors — which Defendants concede included Dr. Beaudouin, *see* Defs. Mem. at 17 — concerning Plaintiff's condition. *See* Compl. ¶¶ 69, 71. Further, Plaintiff alleged that he complained directly to P.A. Singh of worsening symptoms, including spreading and intensifying pain and numbness, and P.A. Singh responded in a callous manner, *see id.* ¶¶ 69, 96, demonstrating that he did not take seriously Plaintiff's complaints, *see Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996) (concluding that an allegation concerning a defendant's "abusive response" to plaintiff's request "further supports permitting

---

show that Dr. Beaudouin took all steps within his power to get Plaintiff examined by a specialist, evidence that he wrote referrals and ineffective prescriptions are unlikely to suffice.

the claim against [the defendant] to survive a motion to dismiss").  Given P.A. Singh's awareness of Plaintiff's continuing medical needs and worsening condition, his awareness that Plaintiff had not been examined by a specialist, and his callous dismissal of Plaintiff's complaints, Plaintiff has alleged adequately that P.A. Singh was deliberately indifferent to Plaintiff's serious medical needs.  *See Adams v. Beaudouin*, No. 09-CV-2136, 2011 WL 240714, at *8–9 (E.D.N.Y. Jan. 24, 2011) (concluding that, on motion for summary judgment, additional discovery would be needed to determine whether any defendants disregarded a risk to plaintiff's health where the record indicated that they each had some knowledge of plaintiff's treatment and medical issues).

### iii.   P.A. Kang

The sole factual allegation concerning P.A. Kang states that, on September 21, 2019, Plaintiff was seen by P.A. Kang for gross hematuria, continued blood in his urine, and persistent pain.  Compl. ¶ 60.  Plaintiff alleges that, on the same day on which he was seen by P.A. Kang, a urinalysis was performed, and Dr. Beaudouin authored yet another referral to a urologist.  *Id.* Based on these allegations, Plaintiff has not pled that P.A. Kang was deliberately indifferent to Plaintiff's serious medical needs.

Although it is hard to believe that P.A. Kang was unaware of the delays in Plaintiff's treatment and his longstanding complaints — if not by virtue of her role in the day-to-day care of inmates at MCC then by the entries in Plaintiff's medical file, which had to have been voluminous by that point — Plaintiff does not plead any facts that raise an inference that P.A. Kang was or should have been aware of any delays in Plaintiff seeing a urologist.  *See Feliz v. City of New York*, No. 18-CV-5023, 2019 WL 6831552, at *6 (S.D.N.Y. Aug. 5, 2019) (recommending dismissal of deliberate indifference claim where plaintiff failed to plead any facts suggesting doctor's awareness of ongoing delays in treatment at the time she treated him).

Similarly, Plaintiff does not allege that P.A. Kang herself should have engaged in any different course of conduct; instead, Plaintiff's allegations suggest that P.A. Kang elevated Plaintiff's medical concerns to Dr. Beaudouin, which resulted in a urinalysis and referral to a specialist. Compl. ¶ 60; *see also Laurent v. Borecky*, No. 17-CV-3300, 2018 WL 2973386, at *3 (E.D.N.Y. June 12, 2018) (dismissing claim against doctor when plaintiff failed to identify a "particular failure," admitted that the doctor ordered the requested test, and plaintiff's complaint amounted to dissatisfaction about whether the doctor was doing all he could). Alleging a single instance of competent treatment, albeit during the months-long period of neglect by others alleged by Plaintiff, does not state a claim for deliberate indifference. *See Green v. Shaw*, No. 17-CV-913, 2019 WL 1427448, at *8 (D. Conn. Mar. 29, 2019) ("[T]he evidence of record shows that each Defendant only interacted with [plaintiff] once—itself strong evidence that the Defendants were not deliberately indifferent."). Accordingly, the claims against P.A. Kang are dismissed.

### C.  Qualified Immunity

Finally, Defendants assert that the Individual Federal Defendants are entitled to qualified immunity on Plaintiff's *Bivens* claims. *See* Defs. Mem. at 20–22. The doctrine of qualified immunity "entitles public officials to freedom from suit for acts undertaken in their official capacity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights." *Martinez v. Simonetti*, 202 F.3d 625, 633–34 (2d Cir. 2000) (cleaned up). A detainee's right to be free from deliberate indifference to serious medical needs is a well-established federal right; even so, "qualified immunity is still available to an official if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Hathaway*, 37 F.3d at 67 (cleaned up).

20

Because the Court has concluded that Plaintiff's claims for deliberate indifference survive as to Dr. Beaudouin and P.A. Singh, they are not entitled to qualified immunity at this stage. *See Hathaway*, 37 F.3d at 69 ("Assuming that [defendant] was deliberately indifferent to [plaintiff's] serious medical needs, he is not entitled to qualified immunity because it would not be objectively reasonable for him to believe his conduct did not violate [plaintiff's] rights."); *Burgess v. Goord*, No. 98-CV-2077, 1999 WL 33458, at *6 (S.D.N.Y. Jan. 26, 1999) (concluding that defendants were not entitled to qualified immunity because court had "already held that plaintiff has adequately pled that such actions were not objectively reasonable by upholding plaintiff's claim of deliberate indifference") (citation omitted). Accordingly, Defendants Beaudouin's and Singh's motion to dismiss based on qualified immunity is denied.

### III.    FTCA Claims

On the same facts supporting his *Bivens* claims, Plaintiff also asserts FTCA claims against the United States for negligence, medical malpractice, and negligent hiring, supervision, and retention. The United States proffers a host of arguments in favor of dismissal of some or all of Plaintiff's FTCA claims. It argues first that Plaintiff's FTCA claims must be dismissed in their entirety because Plaintiff failed to exhaust his administrative remedies before filing his complaint. *See* Defs. Mem. at 23–26. It next argues that several of Plaintiff's FTCA claims — including his claim for negligent hiring — must be dismissed for failure to exhaust; alternatively, the United States asserts that Plaintiff's negligent hiring cause of action fails to state a claim. *Id.* at 27–30, 35–37. Finally, the Government argues that Plaintiff's FTCA claims for conduct that occurred while he was in the custody of the GEO Group are barred by the FTCA's independent contractor exception. *Id.* at 30–33.

Plaintiff's FTCA claims survive the Government's wholesale challenge on failure-to-exhaust grounds, but the Court agrees that Plaintiff's FTCA claims must be trimmed.

### A.  Applicable Law

The FTCA represents a "limited waiver by the United States of its sovereign immunity," allowing for tort suits against the United States under certain circumstances.  *Millares Guiraldes de Tineo*, 137 F.3d at 719.

> Under the FTCA, a private citizen may sue for injuries caused by "the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

*Hamm v. United States*, 483 F.3d 135, 137 (2d Cir. 2007) (quoting 28 U.S.C. § 1346(b)(1)).

The FTCA requires, however, that, before initiating an action in court, (1) a plaintiff must have presented the claim to the appropriate Federal agency, and (2) the plaintiff's claim must have been finally denied, meaning that either the agency denied the claim in writing or failed to decide the claim within six months of it being filed.  28 U.S.C. § 2675(a).  This administrative exhaustion requirement "is jurisdictional and cannot be waived."  *Celestine v. Mount Vernon Neighborhood Health Ctr.*, 403 F.3d 76, 82 (2d Cir. 2005) (citation omitted).  Pursuant to Department of Justice regulations, a claimant may amend a properly presented claim "at any time prior to final agency action or prior to the exercise of the claimant's option under 28 U.S.C. § 2675(a)" to treat a claim as final after six months without a final agency disposition.  28 C.F.R. § 14.2(c).  The filing of an amendment restarts the agency's time to respond to the claim.  *Id.* ("Upon the timely filing of an amendment to a pending claim, the agency shall have six months in which to make a final disposition of the claim as amended and the claimant's option under 28 U.S.C. § 2675(a) shall not accrue until six months after the filing of an amendment.").

Because the FTCA's exhaustion requirement "serves to ease court congestion and to permit expeditious settlement without costly and time-consuming litigation, the claimant must provide the agency with enough information to permit it to conduct an investigation and to

estimate the claim's worth." *Schwartz v. United States*, No. 19-CV-7846, 2020 WL 5578505, at

*3 (S.D.N.Y. Sept. 17, 2020) (cleaned up); *see also Collins v. United States*, 996 F.3d 102, 111

(2d Cir. 2021).  The FTCA "does not require formal pleadings or that a valid legal claim be

alleged"; instead, a plaintiff's administrative claim must include "only the basic elements of

notice of accident and injury and a sum certain representing damages."  *Mejia v. United States*,

No. 13-CV-1789, 2016 WL 4579084, at *5 (S.D.N.Y. Aug. 31, 2016) (cleaned up).

### B.  Administrative Exhaustion and Plaintiff's Later-Filed SF-95

The United States argues that Plaintiff failed to satisfy the administrative exhaustion

requirement as to any of his FTCA claims because he failed to wait the requisite six months after

filing his second SF-95,[11] which operated as an amendment to his original claim.  *See* Defs.

Mem. at 23–26.  In response, Plaintiff argues that his second-filed SF-95 was not an amendment

under 28 C.F.R. § 14.2(c) but a "supplement"; even if the Court were to deem it an amendment,

Plaintiff argues, he still satisfied the presentment requirements of 28 U.S.C. § 2675(a), and,

therefore, dismissal is unwarranted, especially given the severe and pressing medical issues he

faces.  *See* Pl. Opp. at 29–36.  Upon close review of Plaintiff's two SF-95s, the Court concludes

that the second SF-95 was neither an amendment within the meaning of 28 C.F.R. § 14.2(c) nor a

supplement, as Plaintiff argues.  Instead, the two SF-95s represent distinct, standalone

administrative claims, for each of which Plaintiff had to comply with the presentment

requirements of section 2675(a).

Plaintiff's first SF-95 was filed on or around December 16, 2019.  *See* Dkt. 67-1.

Plaintiff claimed damages of $50 million, and stated the basis of his claim as follows:

---

[11]     An "SF-95," or Claim for Damage, Injury, or Death, is the form used to present claims against the United States under the FTCA for, *inter alia*, personal injury caused by a federal employee's negligence or wrongful act or omission occurring within the scope of the employee's federal employment.

> Through an ongoing series of acts and non-acts the Bureau of Prisons did
> not furnish me with necessary, and timely medical care for my pain and
> suffering, and that lack of care has consequently led to my paralysis, and a
> worsened cancer disease.  This occurred while I was an inmate *at the
> Metropolitan Correction Center*, 150 Park Row, NY, NY during the period
> from at least in *March, 2019, to the present*.

*Id.* at 3 (emphasis added).  Plaintiff's claim is defined in terms of the medical care he was

provided while he was incarcerated at MCC, which included the period between March 2019 and

the date of the claim.

Plaintiff's second SF-95 was filed on or around May 5, 2020.  *See* Dkt. 67-2.  The cover

sheet appended to the claim form refers to the "Standard Form 95 and Claim Supplement"

attached; there was no reference to Plaintiff's December 2019 SF-95, nor was there any

indication that Plaintiff then had a claim outstanding with BOP.  *Id.* at 2.  Plaintiff's second SF-

95 claims $20 million in damages.  *Id.* at 3.  The attached claim supplement stated the basis of

Plaintiff's claim, in relevant part, as follows:

> [The c]laim arises out of the care and treatment rendered to RICHARD
> MARTINEZ, *while incarcerated at Queens Detention Facility a/k/a
> Queens Private Detention Facility*, . . . which is operated by The Geo
> Group, Inc., from July 26, 2018 through November 13, 2019, and more
> particularly, in the medical care and treatment rendered to him thereat by
> their agents, servants and/or employees.

*Id.* at 5.  Plaintiff's retainer agreement with his then-counsel, also appended to the SF-95,

similarly states that his claim arose from personal injuries sustained as a result of the negligence

of "Queens Private Detention Facility / The Geo Group, Inc."  *Id.* at 9.

On this record, the Court disagrees with the Government that Plaintiff's second SF-95

operated as an amendment to his first SF-95.  Unlike in the cases cited by the United States,

Plaintiff's later-filed SF-95 made no mention of a pending administrative claim and made no

attempt to correct any information set forth in the original claim.  *See Wright v. City of Santa

Cruz*, No. 13-CV-1230, 2014 WL 3058470, at *5 (N.D. Cal. July 3, 2014) (concluding that a

second SF-95, which appears to have been a hand-edited version of the original SF-95 with an additional addendum attached, constituted an amendment under 28 C.F.R. § 14.2(c). Plaintiff's second SF-95 "did not change the substance of [Plaintiff's] previously filed medical malpractice" claim, nor did it have "any prejudicial impact on [the Government's] ability to properly investigate his pending tort claims or to determine whether it should settle them." *Rosario-Gonzalez v. United States*, 544 F. App'x 5, 7 (1st Cir. 2013).

Critically, Plaintiff's two SF-95s (although not artfully worded and apparently drafted based on less-than-complete records regarding when Plaintiff was transferred from QDF to MCC) appear to pertain to different time periods during which Plaintiff was in the custody of different facilities and was receiving medical care from different providers. Accordingly, notwithstanding the fact that Plaintiff's injuries and the allegedly negligent conduct by medical professionals at each facility overlap, the Court understands Plaintiff's first SF-95 to assert a claim for the negligence of those at MCC in the amount of $50 million, while Plaintiff's second SF-95 asserts a claim for the negligence of those at QDF in the amount of $20 million. *See Turner ex rel. Turner v. United States*, 514 F.3d 1194, 1200–01 (11th Cir. 2008) (deeming three separate SF-95s to constitute three distinct claims on behalf of three different claimants, all arising out of the same injury). Plaintiff's later-filed SF-95 neither amended nor supplemented his December 2019 administrative claim; instead, it raised a standalone claim against the United States for the conduct of its contractor, QDF. Applying section 14.2(c) here would be "tantamount to erecting a barrier of technicalities and sacrificing the entitlement of a claimant to his or her cause of action against the government without a corresponding showing that doing so would promote the efficient investigation of a claim by the agency." *Rosario-Gonzalez*, 544 F. App'x at 8 (cleaned up).

The Court thus agrees with Plaintiff that "the later filed [document] in no way altered or changed Mr. Martinez's original claims."  Pl. Opp. at 32.  The Court disagrees, however, with Plaintiff's contention that "[t]he May 5, 2020 [document] merely clarified the relevant dates," "provided some additional detail in medical terminology," and "reduce[d] the value of the claim."  *Id.*  Plaintiff's assertion that the "GEO Group is an independent contractor for whom the presentment requirements of Section 2675(a) are not required" is also unavailing.  *Id.* at 33 n.5. At the time Plaintiff filed his initial administrative claim and his complaint in this action, he plainly believed that he could assert an FTCA claim against the United States based on the GEO Group's alleged negligence: his second administrative claim was dedicated exclusively to the care and treatment of Plaintiff while he was incarcerated at QDF, and his complaint asserts multiple FTCA claims arising in part out of negligence and medical malpractice that occurred during his incarceration at that facility.  That Plaintiff now concedes that the United States cannot be held liable for the GEO Group's alleged conduct or omissions does not in any way factor into the Court's analysis of whether the second-filed SF-95 constituted an amendment, supplement, or distinct claim.

Because the Court construes Plaintiff's second SF-95 as a separate administrative claim, Plaintiff was required to comply with the administrative exhaustion requirements of 28 U.S.C. § 2675(a) with respect to each of his two administrative claims.  *See Dalrymple v. United States*, 460 F.3d 1318, 1325 (11th Cir. 2006) ("The FTCA requires that each claim and each claimant meet the prerequisites for maintaining a suit against the government."); *cf. Keene Corp. v. United States*, 700 F.2d 836, 842 (2d Cir. 1983) (requiring claimant to present government with definite damages amount as to each claim where claims are aggregated for purposes of the FTCA). Because Plaintiff complied with the administrative exhaustion requirements with respect to the claim asserted in the first SF-95 but not the second, the United States' motion to dismiss is

granted with respect to any claims arising out of Plaintiff's second SF-95 against the GEO Group.[12]

### C. Administrative Exhaustion and Claims Not Alleged in Plaintiff's SF-95s

The United States also seek dismissal of Plaintiff's FTCA cause of action alleging negligent hiring, supervision, and retention of BOP staff because Plaintiff did not include notice of or allegations supporting this cause of action in his administrative claims.[13]  *See* Defs. Mem. at 27–28.  In response, Plaintiff contends that he did not have to delineate specifically each cause of action because the BOP had the necessary information in its possession and his administrative claim provided the Government with enough information to investigate the claim.  Pl. Opp. at 36–38.  Plaintiff's argument misses the mark.  Because Plaintiff did not explicitly assert the negligent hiring cause of action and because the allegations asserted in his administrative claim would not have given rise to an investigation into negligent hiring, supervision, or retention, Plaintiff failed to exhaust his FTCA hiring claim.

Plaintiff's properly exhausted administrative claim asserts only that the United States "did not furnish [Plaintiff] with necessary[] and timely medical care."  Dkt. 67-1 at 3.  In similar

---

[12]      As noted, Plaintiff concedes that the GEO Group is an independent contractor of the United States and thus "does not oppose dismissal of claims against the United States for actions taken by the G[EO] Group." Pl. Opp. at 4 n.1; *see also Roditis v. United States*, 122 F.3d 108, 111 (2d Cir. 1997) (per curiam) ("[A]s a general rule, sovereign immunity precludes suits against the United States for injuries caused by its independent contractors."). Accordingly, even had the Court deemed Plaintiff to have administratively exhausted his claims pertaining to the care he received while at QDF, the Court would dismiss the portion of Plaintiff's FTCA claims against the United States predicated on his treatment at QDF, a GEO Group facility.

[13]      The United States also sought dismissal of Plaintiff's FTCA claims for medical malpractice and negligence predicated on the Government's alleged failure to respond to requests for Plaintiff's medical records and on Plaintiff having been negligently and recklessly chained to his Bellevue Hospital bed in November 2019. *See* Defs. Mem. at 27–30.  Although Plaintiff opposed the Government's arguments seeking dismissal of other portions of his FTCA claims, Plaintiff's opposition does not respond to these arguments.  Accordingly, the Court deems these claims to have been abandoned. *See Romeo & Juliette Laser Hair Removal*, 2014 WL 4723299, at *7.  The complete absence of any facts supporting these allegations in either of Plaintiff's SF-95s would similarly warrant dismissal. *See, e.g.*, *Cabrera v. United States*, No. 18-CV-7270, 2020 WL 5992929, at *11 (S.D.N.Y. Oct. 9, 2020) (deeming plaintiff's claim of right knee injury unexhausted and dismissing claim for lack of subject-matter jurisdiction where SF-95 alleged only injury to neck, back, and right knee).

cases in which plaintiffs have alleged analogous medical malpractice, courts in this district have readily dismissed claims based on negligent hiring or supervision.  *See, e.g.*, *Lassic v. United States*, No. 14-CV-9959, 2015 WL 5472946, at *4 (S.D.N.Y. Sept. 16, 2015), *aff'd*, 668 F. App'x 395 (2d Cir. 2016); *Downs v. United States*, No. 06-CV-396, 2009 WL 2611226, at *3 (N.D.N.Y. Aug. 24, 2009); *see also Schwartz*, 2020 WL 5578505, at *3 ("Analogous cases have similarly held that when a notice of claim asserts one cause of action, but fails to assert a different cause of action comprised of unique elements, such notice does not meet the FTCA's exhaustion requirement for the latter claim.") (citation omitted).

　　　Plaintiff's reliance on cases such as *Johnson ex rel. Johnson v. United States*, 788 F.2d 845, 849 (2d Cir. 1986), is misplaced.  In circumstances in which the allegations in an administrative claim would necessarily result in an investigation touching on facts pertinent to a negligent hiring claim, the failure to include a specific cause of action for negligent hiring in the administrative claim is not fatal.  *See id.* (arising in the context of a claim stemming from a sexual assault).  Here, however, there is no reason to believe that that the investigation prompted by Plaintiff's administrative claim would inspire BOP to investigate whether there was negligence involved in hiring or supervising the employees who are implicated in the claim; instead, based on Plaintiff's allegations, BOP's investigation would begin and end with the care, or lack thereof, provided to Plaintiff during the period in which he was in BOP custody.  *See Downs*, 2009 WL 2611226, at *3.

　　　Accordingly, Plaintiff's FTCA claim for negligent hiring, supervision, or retention is dismissed for failure to exhaust.[14]

---

[14]　　Because the Court concludes that Plaintiff has not exhausted his negligent hiring claim, the Court need not assess the Government's alternative argument that Plaintiff failed to state a claim for relief as to this cause of action. Were the Court to consider the issue, however, it would determine that Plaintiff's allegations fall woefully short of stating a cause of action for negligent hiring because of, *inter alia*, the total absence of factual allegations that any of the Individual Federal Defendants had a propensity to engage in the alleged tortious conduct or that BOP was or

## CONCLUSION

For the foregoing reasons, Federal Defendants' motion to dismiss is GRANTED in part and DENIED in part.  The Clerk of Court is respectfully directed to close the open motion at Dkt. 65.  The Clerk of Court is further directed to terminate P.A. Kang and Warden of MCC as defendants.

**SO ORDERED.**

**Date:   September 16, 2021
New York, New York**

_____
**VALERIE CAPRONI
United States District Judge**

---

should have been aware of such a propensity; Plaintiff's reference to allegations concerning the Individual Federal Defendants' conduct in connection with Plaintiff's own claims does not, as a matter of law, satisfy his burden.  _See Doe v. Alsaud_, 12 F. Supp. 3d 674, 682–83 (S.D.N.Y. 2014) (requiring "specific allegations of the employee's _past wrongdoing_ to provide a basis from which to infer the employer's knowledge" (emphasis added)).